**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1930-24

DOROTHY GUO AND HENRY
ZHENG,

     Plaintiffs-Appellants,

v.

ZONING BOARD OF
ADJUSTMENT OF THE
TOWNSHIP OF MILLBURN,
AND NARAYAN & AYRA
HEGDE,

     Defendants-Respondents.

_____

Argued February 2, 2026 – Decided March 2, 2026

Before Judges Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2897-24.

Dorothy Guo and Henry Zheng, appellants, argued the cause on appellants' behalf.

Robert F. Simon argued the cause for respondent Zoning Board of Adjustment of the Township of

Millburn (Herold Law PA, attorneys; Robert F. Simon, of counsel; Christine M. Faustini, on the brief).
Derek W. Orth argued the cause for respondents Narayan & Ayra Hegde (Inglesino Taylor, attorneys; Derek W. Orth, of counsel and on the brief; John T. Eder, on the brief).

PER CURIAM

In this action in lieu of prerogative writs, plaintiffs Dorothy Guo and Henry Zheng appeal from an February 7, 2024 order granting judgment in favor of defendants Narayan and Ayra Hegde and the Zoning Board of Adjustment of the Township of Millburn (the Board). We affirm.

I.

Plaintiffs challenged the Board's decision that approved a development application with variances filed by the Hegdes defendants and which concerned the Hegdes' single-family home located on Sagamore Road in Millburn Township, also designated as Lot 11, Block 101 on the Official Tax Map of the Township of Millburn (the Property), and located in the R-4 residential zone. Sagamore Road proceeds along a mountain scape, and the rear of the property abuts South Mountain Reservation. Several of the properties along Sagamore Road are encumbered by steep slopes. The Hegdes' property is located near the peak of Sagamore Road and sixty-five percent of the property is encumbered by such slopes.

2

A-1930-24

In 2023, the Hegdes filed an application with the Board to raze their existing house, which required extensive mold remediation, to its foundation in order to construct a new home. As part of the proposed reconstruction plan, they also intended to replace their existing steep, narrow, and winding driveway with a safer and more functional driveway which would permit an ambulance and other emergency vehicles access to their home.

In addition, the Hegdes' reconstruction plan incorporated a stormwater management system, which was designed to protect the house and surrounding properties from excessive stormwater runoff. The Hegdes would maintain the existing, detached two-car stone garage for use as passive storage because constructing a basement would have required the blasting of underground rock.

The Hegdes application requested: (a) the disturbance of 15,101 square feet of steep slopes, where the maximum disturbance of steep slopes in the R-4 zone is limited to 1,000 square feet of steep slope disturbance; (b) the alteration of the site elevations over 1 foot within 2 feet from the property line, where the alteration of the site elevations over 1 foot within 5 feet of a property line in a steep slope area is permitted; (c) a 3 foot separation between retaining walls 4 feet in height, where the minimum separation permitted between 4 foot high retaining walls is 4 feet in the R-4 zone; (d) a 2 foot separation between retaining

A-1930-24

walls 4.75 feet in height, where the minimum permitted separation between retaining walls 4.75 feet in height is 4.75 feet; and (e) a front yard retaining wall 4.5 feet in height, where the maximum permitted height of a front yard retaining wall in the R-4 zone is 2 feet in height. On January 22, 2024, following a public hearing, the Board voted unanimously to approve the application by way of resolution Cal. No. 3952-23.

The hearing conducted by the Board considered extensive testimony from three professional experts. Specifically, the Hegdes called as witnesses: Richard Keller, a licensed engineer and planner; Marvin Clawson, a licensed architect; and Brian Hirsch, a licensed landscape architect.

Keller testified that Sagamore Road is effectively a rural road with steep slopes above and below which is "[v]ery different than most of the rest of the town." The trees which would be disturbed are aged from forty to sixty years old and efforts are to be made to preserve the oldest 100-year-old oak tree on the lot. Keller stated that the driveway on the property is the "least safe and most daunting driveway" he has driven on and noted "[Mr. Hegde] . . . slid into the wall coming down" the driveway. He provided photographs which depicted a failing retaining wall, the stone garage, the driveway, and sixteen feet of stairs from the driveway to the home.

Keller also provided that the goal in altering the foundation was to reduce the sixteen feet of stairs to ten feet leading directly into the garage which could only be done through a widening of the driveway and sliding the home twenty feet back into the steepest part of the site. In addition, he noted the property faced mold issues as the slope came down straight into the back of the house, water pitches against the home, and this caused a build-up of water in a crawl space which created the mold problem. To remediate this mold issue, Keller testified that the proposed development would keep the existing gutter, build a "breaker" and any water that comes down will drop into a break leading directly into a twenty-four-inch storm sewer.

He further stated that the existing garage would be kept untouched to limit excavation into the existing rock and to provide the homeowners with passive storage. In addition, he stated that the retaining wall would be removed and replaced with a series of stone. Keller also testified that the garage was at an "elevation [of] 410 [feet] and the primary entrance to the home [was] 426 [feet]" and was also "completely disassociated from any primary habitable space."

With respect to remediation of drainage on the property, Keller testified there would also be lateral grading of the property to create flatter plateaus than the existing grade to slow the water runoff into inlets to bring the water around

<span>A-1930-24</span>

the house rather than into the house itself. Additionally, he stated the proposed plan would provide two storm water intercepts for discharge into the storm pipe on Sagamore Road.

In total, he stated a conservative estimate of roughly 15,500 square feet of disturbance would result. Keller testified that currently an ambulance could not drive up the driveway, but the proposed alterations would permit such an emergency vehicle entry. He also stated that the proposal "is really about getting a house that manages the water that comes off the road, . . . bifurcate . . . water down around [the home] and out . . . into the storm sewer system." Keller provided that the current stormwater management traps water underneath the existing home. In sum, he opined the proposed plan would "tak[e] a site that has no discernable stormwater management, other than keeping [the water] in the crawl space to bring mold, and [] creating a way to get rid of that with no danger to the neighbors and no adverse impact on the town sewer system."

Keller also met with the neighbors, and they expressed concerns about the proposal because of the proposed grading within five feet of the property lines. Keller confirmed that the need for the one-foot property line variance, where five feet within the property line is permitted, was no longer necessary.

A-1930-24

Chairman Ploetner expressed concern about the proposed plan creating a forty percent disturbance on the lot. Keller responded that Sagamore is a unique property and "under the current ordinance you wouldn't have developed any properties on the uphill side of Sagamore Road . . . [but] the township is better for it." Chairman Ploetner inquired as to whether it "is . . . possible to trim some of this disturbance[?]" Keller further responded that, under these circumstances, the grades of the lot could not be reduced further than fifteen percent, the design is optimal, and there would not be any negative impact from the design which would provide the homeowners with a dry home and a safe driveway.

Following this exchange, the Board's attorney, Robert Simon, Esq., questioned whether an alternative design for stormwater management, specifically to shift the location of the water basins, could be pursued to result in less disturbance than is proposed. Keller responded that shifting the basins would produce a buildup of water above the home and the current design releases water at a "controlled rate into the town storm sewer system."

The Board next opened questions to the public and plaintiff, Dorothy Guo, expressed concern about the driveway and asked, "why [are] you changing the driveway entrance so close to my driveway" as the problem is that a "173 f[oo]t [driveway] is wider than most of the property on Sagamore." Chairman Ploetner

7

responded and provided that "it's as of right[,] [s]o honestly he doesn't have to answer the question . . . [h]e can do that[,] . . . he's not asking for a variance for the driveway[,] it can lawfully exist." Guo then expressed concern about the detached garage not complying with the zoning code and what will be done to bring it to code. Keller stated that the garage is "an existing nonconforming condition" that has "been there for . . . more than 100 years, so it predates zoning from the '50s."

Clawson testified that the proposed project was supported by a report written by a structural engineer, which supported the conclusion that the home could be safely rebuilt on the foundation. Clawson provided that the alterations to the home itself permitted natural light access into the home. He provided an illustration of the site which demonstrated that a majority of the areas of the retaining walls and driveway were to be kept preserved, but altered enough to prevent migration of water into the home. He further testified that the "whole design was predicated on the fact that [there] would [be] a symbiotic relationship with the landscape."

As noted, Hirsch, a licensed landscape architect, also testified. Hirsch stated the proposed alterations to vegetation on the hillside near the driveway would stabilize the slopes and lend itself to the safety of the driveway. In turn,

Chairman Ploetner asked Hirsch whether there is a way to make the alterations a bit less pronounced to serve the same purpose with respect to water mitigation. Hirsch provided that a reduction in certain areas can be accomplished to serve the task of creating a safe driveway to drive up and down on without producing washouts. He further testified that the goal of the vegetative swale is to both stabilize the landscape and slow the flow of water.

Hirsch also testified that the curve of the driveway will preserve two existing trees but will require removal of six trees. Hirsch provided that no more than two trees larger than eight inches would be lost, neighboring property owners would not suffer the loss of privacy nor lose existing shade on their property and there would be a replacement of the same number of lost trees with three-and-a-half inch trees.

Chairman Ploetner and Board Member Regina Truitt questioned Hirsch and asked whether cutting the roughly 15,000 square feet of disturbance in half would impact the proposed drainage plan. Hirsch responded that he would not recommend doing so as this would eliminate modifications which would slow down running water. In addition, Hirsch noted that the proposed grading and vegetation on the property would help all property owners downhill.

A-1930-24

Keller was recalled to provide summation testimony on the statutory criteria. Keller stated that the property is near the summit of Sagamore Road and is one of the steeper properties on the hillside. He provided that the proposed plan would disturb the existing manmade topography which created a hardship in redeveloping the existing property without seeking variance relief. He testified that the proposed plan advances the general welfare, is consistent with sound planning and engineering principles in the community as well as on Sagamore Road, the proposed stormwater management remediates deficiencies of the existing home, and the stormwater management will protect the neighborhood.

The Board then opened the hearing for a public comment period. Guo began as the first member of the public and commented that the proposed development: (a) does not face a hardship for the variance application as the steep slope driveway is a common and shared characteristic of adjacent properties; (b) has a long existing driveway which shows that the variance does not address a unique hardship when compared to other properties; (c) prompted her to download a digital level application and drive up others' driveways to measure slope numbers of driveways located along Sagamore Road; (d) includes the garage which must be removed to comply with the zoning code; (e) has water

A-1930-24

that runs off the garage which entered her driveway and eroded the surface of her driveway; (f) would have a new driveway entrance and this would impact her property value and cause unnecessary traffic congestion; (g) disturbs the soil which will destroy and jeopardize the foundation of the entire neighborhood; and (h) should be carefully evaluated by the Board with respect to the impacts of the proposed variance on the adjoining property to strike a balance between redevelopment and preservation of the community.

After considering the testimony and documentary evidence submitted by defendants, as well as the public commentary, the Board unanimously approved the application and detailed its reasoning in a March 4, 2024 resolution. The Board determined the applicants sufficiently demonstrated that the proposed construction "preserved the character of the subject property" and that "any negative impact from the proposed improvements [were] negligible and not a substantial detriment." The Board specifically determined that the applicants successfully met the positive and negative criteria for variance relief pursuant to N.J.S.A. 40:55D-70(c)(1) and (2).

As to subsection (c)(1), the Board concluded it was appropriate to grant the variance relief to permit the proposed construction as the relief was "related to existing conditions [which] affect[ed] the property, the location of existing

11

and replacement structures, site improvements and encumbrances thereon, including the abundance of steep slopes." The Board specifically provided that "the subject property's . . . conditions, including the location of the existing dwelling on the downslope of the extreme upgrade in the rear of the [] property, the unsafe driveway condition, and the extensive steep slopes on the subject property, are all hardships." The Board found the conditions, that existed to be extraordinary and exceptional conditions which affected the property and resulted in practical difficulties and undue hardship to the applicants.

The Board further determined that the applicants satisfied subsection (c)(2). Specifically, the Board concluded under N.J.S.A. 40:55D-2 the application met "subsections[:] (a) providing for the general welfare and safety of the subject property and the surrounding neighborhood; (b) to secure safety from a flood; (c) to provide adequate light, air, and open space; and, (i) to promote a desirable visual environment." The Board also found that the application was consistent with the character of the neighborhood and would improve the functionality and safety of the property. In addition, the Board determined that the proposed construction would not undermine the intent and purpose of the Township's Master Plan.

On April 26, 2024, and as amended on May 9, 2024, plaintiffs appealed the Board's decision by filing a complaint in lieu of prerogative writs in which they requested the court reverse the Board's decision. Plaintiffs specifically asserted that granting a variance of this magnitude "without sufficient and adequate justifications" would eliminate the obligation to comply with zoning codes. Additionally, they contended that the Board's decision that no variance is required for the attached garage was "arbitrary, capricious, [and] unreasonable." They further argued that as to the slope disturbance the applicants failed "to meet the 'negative criteria' for variance relief." Plaintiffs also maintained that "the sustainable detriments to the public good substantially outweigh the benefits from the variance." Plaintiffs reiterated that the Board's decision of granting the slope variance was also "arbitrary, capricious, unreasonable, [and was] not supported by reasonable and sufficient evidence."

After considering the parties' arguments and submissions, Judge L. Grace Spencer entered judgment in favor of defendants and issued a conforming order on February 7, 2025. The judge concluded the Board's determination was not "arbitrary, capricious, or unreasonable."

In contemplating the demonstrated hardship required to be shown in order to approve variance relief under N.J.S.A. 40:55D-70(c)(1), the judge explained

13

the Board's decision was supported by recognition of "extraordinary and exceptional circumstances [which] uniquely affect[ed] the Hegdes' property." The judge also explained that the Board had found "strict application of the steep slope and retaining wall ordinances would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the Hegdes." She rejected plaintiffs' arguments that the Board's decision was unsupported. Judge Spencer explained that the Board accepted the Hedges' expert testimony, which was uncontradicted, and the evidence and testimony presented demonstrated that granting the variance would not create a substantial detriment to the public good. The judge therefore determined that the Board's decision, contrary to plaintiffs' arguments, was not arbitrary, capricious, or unreasonable.

The judge also determined that the Hegdes sufficiently satisfied the positive criteria pursuant to N.J.S.A. 40:55D-70(c)(2). Specifically, Judge Spencer explained that the record reflected the Hegdes' "request for variances was rooted in their desire to create a new home with a safer driveway and better stormwater management." In addition, she explained the record provided that "the storm water management would better direct water to the benefit of the property and others downhill." The judge determined that the application

14

fulfilled several purposes of the Municipal Land Use Law (MLUL) as contained in N.J.S.A. 40:55D-2.

Judge Spencer rejected the plaintiffs' argument that the Hegdes failed to provide adequate, sufficient, and credible evidence to meet the (c)(2) variance requirements. The judge noted that plaintiffs offered no expert testimony at the time of the hearing and offered merely conclusory statements regarding the impact of the proposed plans. Judge Spencer determined these arguments and statements were unsupported at the time of the hearing and remained unsupported during the issuance of the order. The judge also determined that "[t]estimony in support of the application . . . was unrefuted and there is sufficient evidence in the record to support the Board[']s decision."

Judge Spencer also concluded that the application satisfied the negative criteria for a variance pursuant to N.J.S.A. 40:55D-70(c). She explained that substantial testimony was presented by experts on behalf of the applicant which demonstrated the potential benefits to the public. Judge Spencer rejected plaintiffs' argument that the variances were detrimental to the environment as there was no evidence proffered to support such statements.

In addition, the judge determined that under N.J.S.A. 40:55D-68 the detached garage did not need a variance. Judge Spencer explained that the

statute permitted the continuation of any nonconforming structure and the stone garage predated the existing house. She rejected plaintiffs' arguments that the application to demolish the home also required removal of the pre-existing garage as well as plaintiffs' reliance on Motley v. Borough of Seaside Park Zoning Bd. of Adjustment, 430 N.J. Super. 132 (App. Div. 2013), and explained that the circumstances in Motley caused more than partial destruction to the nonconforming use and was inconsistent with the applicable zoning permit. The judge further distinguished Motley because here the Hegdes merely intend to use the stone garage less intensely than its historical use. She also provided that Keller's testimony that the stone garage was completely disassociated from the primary habitable space was not contradicted by any competent proofs in the record. Judge Spencer accordingly determined that Board's decision to continue the non-conforming use of the garage without a variance was reasonable and neither arbitrary nor capricious. This appeal followed.

II.

On appeal, plaintiffs reprise the same arguments rejected by Judge Spencer. First, they assert that the detached garage is in fact attached to the main building and does not comply with N.J.S.A. 40:55D-68. Plaintiffs further contend the Board's resolution failed to articulate a basis for concluding the

16

(c)(2) positive criteria were met. They also argue that applicants failed to provide proof that the disturbance would not substantially impair the intent and purpose of Millburn Township ordinances. Plaintiffs also maintain that the Board's conclusion that the proposed plan can be accomplished without undermining the township's master plan lacks support in the record.

In addition, plaintiffs contend the Board did not fully consider the ramifications of the allegedly nonconforming garage and its decision was thus arbitrary, capricious, and unreasonable. Plaintiffs argue that the applicants failed to demonstrate that steep slopes and an unsafe driveway are unique compared to neighboring properties and the applicants' design preferences do not justify the variance relief and Keller's expert testimony was based on unsubstantiated findings. We disagree with all of these arguments.

## III.

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division." Advance at Branchburg II, LLC v. Branchburg Twp. Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013). "We defer to a municipal board's factual findings as long as they have an adequate basis in the record." Ibid. However, a zoning board's legal determinations are subject to de novo review. Jacoby v. Zoning Bd. of

Adjustment, 442 N.J. Super. 450, 462 (App. Div. 2015). "[C]ourts ordinarily should not disturb the discretionary decisions of local boards that are supported by substantial evidence in the record and reflect a correct application of the relevant principles of land use law." Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 58-59 (1999).

"[W]hen a party challenges a zoning board's decision through an action in lieu of prerogative writs, the zoning board's decision is entitled to deference." Kane Props., LLC v. City of Hoboken, 214 N.J. 199, 229 (2013). "Courts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning." Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super. 177, 199 (App. Div. 2001); see also Branchburg, 433 N.J. Super. at 253. "[T]he burden is on the challenging party to show that the zoning board's decision was 'arbitrary, capricious, or unreasonable.'" Price v. Himeji, LLC, 214 N.J. 263, 284 (2013) (quoting Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296 (1965)).

The Legislature has delegated to municipalities the power to regulate local land use through the MLUL, N.J.S.A. 40:55D-1 to -163. Where the proposed subdivision is not in compliance, planning boards also have the power to grant variances under N.J.S.A. 40:55D-70(c), commonly called "(c)" variances.

A-1930-24

N.J.S.A. 40:55D-70(c) states, in relevant part, that a Board has the power to grant variances:

> (1) [w]here: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or . . . an extraordinary and exceptional situation uniquely affecting a specific piece of property . . . the strict application of any regulation pursuant to . . . this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property . . . [or] (2) where in an application or appeal relating to a specific piece of property the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment.
>
> [N.J.S.A. 40:55D-70(c).]

Under subsection (c)(1), an applicant must show that exceptional or undue hardship will result if the variance is not granted. Chirichello v. Zoning Bd. of Adjustment, 78 N.J. 544, 552 (1979). What is essential is that the unique condition of the property must be the cause of the hardship claimed by the applicant. Lang, 160 N.J. at 56.

The hardship criteria of a (c)(1) variance is unaffected by personal hardship, financial or otherwise. Ten Stary Dom P'Ship v. Mauro, 216 N.J. 16, 29 (2013). The focus is "whether the strict enforcement of the ordinance would cause undue hardship because of the unique or exceptional conditions of the

specific property." Lang, 160 N.J. at 53. The hardship standard does not require the applicant to prove that without the variance the property would be zoned into inutility. Id. at 54. The applicant need only demonstrate the property's unique characteristics inhibit the extent to which the property can be used. Id. at 55.

With respect to (c)(2) applications, our Supreme Court has stated:

> By definition, . . . no (c)(2) variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property. The focus of a (c)(2) case, then, will be not on the characteristics of the land that, in light of current zoning requirements, create a "hardship" on the owner warranting a relaxation of standards, but on the characteristics of the land that present an opportunity for improved zoning and planning that will benefit the community.
>
> [Kaufmann v. Planning Bd., 110 N.J. 551, 563 (1988).]

A (c)(2) variance, then, is not based upon the "hardship" but "requires a balancing of the benefits and detriments from the grant of the variance." Bressman v. Gash, 131 N.J. 517, 523 (1993). The analysis focuses on advancing the purposes of the MLUL and the benefits to the community.

In sum, the application for a variance under (c)(2) requires:

> (1) [that it] relates to a specific piece of property; (2) that the purposes of the [MLUL] would be advanced by a deviation from the zoning ordinance requirement; (3) that the variance can be granted without substantial

detriment to the public good; [and] (4) that the benefits of the deviation would substantially outweigh any detriment. . . .

[William M. Cox & Stuart R. Koenig, New Jersey Zoning and Land Use Administration, § 29-3.3 at 441 (2023) (citations omitted).]

The MLUL further provides that a (c) variance under either subsection cannot be granted unless the applicant establishes what is colloquially referred to as the negative criteria, proving "that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70; see also Lang, 160 N.J. at 57 ("Whether a . . . variance is sought under subsection (c)(1) or (c)(2), the applicant must also satisfy the familiar negative criteria. . . .").

The "negative criteria" are not satisfied where "merely the purposes of the owner will be advanced." Kaufmann, 110 N.J. at 563. Rather, the community must receive a benefit due to the fact that the variance represents a better zoning alternative for the property. Ibid. Thus, the focus of the "negative criteria" is on the characteristics of the land that present an opportunity for improved zoning and planning for the benefit of the community. Ibid. The "negative criteria" are not satisfied where "merely the purposes of the owner will be advanced."

21

Kaufmann, 110 N.J. at 563. Rather, the community must receive a benefit due to the fact that the variance represents a better zoning alternative for the property. Ibid. Thus, the focus of the "negative criteria" is on the characteristics of the land that present an opportunity for improved zoning and planning for the benefit of the community. Ibid. The "negative criteria" also focus on the impact that the variance will have on the specific adjacent properties affected by the deviations from the ordinance, Lang, 160 N.J. at 57, as well as any detriment to the zoning plan, Kaufmann, 110 N.J. at 565.

The board also has authority to act in connection with an application brought pursuant to N.J.S.A. 40:55D-68, which provides, in relevant part:

> Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof.
>
> The prospective purchaser, prospective mortgagee, or any other person interested in any land upon which a nonconforming use or structure exists may apply in writing for the issuance of a certificate certifying that the use or structure existed before the adoption of the ordinance which rendered the use or structure nonconforming. The applicant shall have the burden of proof.
>
> [N.J.S.A. 40:55D-68.]

The MLUL defines "[n]onconforming use" as "a use or activity which was lawful prior to the adoption, revision or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reasons of such adoption, revision or amendment." N.J.S.A. 40:55D-5. N.J.S.A. 40:55D-68 has been "consistently construed as allowing a property owner to indefinitely continue a nonconforming use." S&S Auto Sales, Inc v. Zoning Bd. of Adj. for Borough of Stratford, 373 N.J. Super. 603, 622 (App. Div. 2004).

Further, "it is well settled that the Board 'has the choice of accepting or rejecting the testimony of witnesses. Where reasonably made, such choice is conclusive on appeal.'" Kramer, 45 N.J. at 288 (quoting Reinauer Realty Corp. v. Nucera, 59 N.J. Super. 189, 201 (App. Div. 1960)); see also Bd. of Educ. of Clifton v. Zoning Bd. of Adjustment, 409 N.J. Super. 389, 434 (2009) ("Zoning boards may choose which witnesses, including expert witnesses, to believe.").

Pursuant to these principles and having thoroughly reviewed the record, we affirm for the reasons expressed in Judge Spencer's thorough and well-written opinion. It is clear to us the judge considered N.J.S.A. 40:55D-70(c)(1), (c)(2), and N.J.S.A. 40:55D-68 in issuing her decision. We are satisfied the judge properly considered the hardship presented along with the positive and

negative criteria under subsection (c) in concluding the Board's determinations were supported by substantial and credible evidence in the record.

The Board specifically addressed the advancement of the purposes of the MLUL in its resolution. The Board determined that the variance: (a) provided for the general welfare and safety of the subject property and the surrounding neighborhood; (b) secured safety from a flood; (c) provided adequate light, air, and open space; and (i) promoted a desirable visual environment. These findings were supported by Keller's, Clawson's, and Hirsch's testimony that the proposed plan would provide stormwater management by way of "two storm water intercepts for discharge into the storm pipe," the "proposed grading . . . would help all property owners downhill," would present "no danger to the neighbors and no adverse impact on the town sewer system," and would increase the safety of the driveway "[b]y making a large bowl instead of a confining luge[.]"

We find unpersuasive plaintiffs' contentions the Board's conclusion that the proposed plan can be accomplished without undermining the township's master plan lacks support in the record. The variances sought and obtained by the applicant were found by the Board to be consistent with the character of the neighborhood. Contrary to plaintiffs' arguments, the Board specifically found

24

that the proposed construction would not undermine the intent and purpose of the township's master plan.

Before us, plaintiffs, relying on N.J.S.A. 40:55D-68, argue that the detached garage is in fact attached to the main building and does not comply with the statute. At the Board's hearing in response to Guo's concerns about the alleged non-compliance of the garage, Keller provided expert testimony that the garage is "an existing nonconforming condition" that has been on the property "for . . . more than 100 years, [and] predates zoning from the '50s." We find that the record adequately supports the Board's findings that the garage was completely disassociated from the primary habitable space and that "variance relief [was not] required for the continued use of the detached garage . . . ."

To the extent we have not addressed the remaining arguments raised by plaintiffs it is because we have determined they lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

25

A-1930-24